**SALENTINE AND COMPANY, Inc.**

v.

**UNITED STATES.**

**C. D. 2129; Protest Nos. 58/3483 to 58/3486.**

United States Customs Court, Second Division.

Oct. 28, 1959.

802

Gilbert & Segall, New York City (Harold R. Tyler, Jr., New York City, and Richard Fitzsimmons, Milwaukee, Wis., of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Samuel D. Spector, New York City, trial attorney), for defendant.

Before LAWRENCE, RAO, and FORD, JJ.

LAWRENCE, Judge.

Four importations of so-called "Theratron Junior Beam Therapy Machines,"

also known as "Cobalt 60 Beam Therapy Equipment," and their parts, were classified by the collector of customs as electrical therapeutic devices and parts thereof pursuant to the provisions of paragraph 353 of the Tariff Act of 1930 19 U.S.C.A. § 1001, par. 353. Duty was imposed thereon, depending upon the date of entry, at the rate of $17\frac{1}{2}$ per centum ad valorem, in accordance with the modification of said paragraph by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, or at the rate of $16\frac{1}{2}$ per centum ad valorem, by virtue of the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108.

The four protests relating to the foregoing importations were consolidated for trial and determination.

Plaintiff claims by its protests that the merchandise above described should be classified in said paragraph 353 as electrical X-ray apparatus and dutiable at the rate of $8\frac{3}{4}$ per centum ad valorem provided by the Torquay protocol to said general agreement, 86 Treas.Dec. 121, T. D. 52739, supplemented by the Presidential notification thereto, 86 Treas.Dec. 265, T.D. 52763, or at the rate of $8\frac{1}{4}$ per centum ad valorem, pursuant to the sixth protocol of supplementary concessions, supra.

The provisions of paragraph 353, as modified, supra, read as follows:

Paragraph 353, as modified by the General Agreement on Tariffs and Trade, supra:

"Electrical apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
 "Telegraph (including printing and typewriting), telephone, and therapeutic (including diagnostic) ........................ $17\frac{1}{2}$% ad val.
   \* \* \* \* \* \* \* \* \* \*
  "X-ray ............................ 10% ad val."

Paragraph 353, as modified by the sixth protocol of supplementary concessions to the general agreement, supra:

> "Electrical therapeutic (including diagnostic) apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for ................................. 16½% ad val."

Paragraph 353, as modified by the Torquay protocol to the general agreement, supra:

> "Electrical X-ray apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (except X-ray tubes) ................................. 8¾% ad val."

Paragraph 353, as modified by the sixth protocol of supplementary concessions to the general agreement, supra:

> "Electrical X-ray apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (except X-ray tubes).. 8¼% ad val."

---

In its brief, however, plaintiff relies upon the doctrine of similitude, asserting that "there is similitude as defined in Paragraph 1559 between these cobalt units and X-ray apparatus as defined in Paragraph 353 of the Tariff Act of 1930, as amended. Consequently, not only the weight of the evidence but all the credible evidence establishes that these Cobalt–60 units should be classified as X-ray equipment dutiable at the ad valorem rate of 8¼% to 8¾%." Citing cases. In its "supplemental memorandum" filed herein, plaintiff again invokes similitude to support "the basic and consistent position of the importer."

While the similitude claim need not be specifically pleaded in a protest being a rule of construction (United States v. M. Rice & Company, 257 U.S. 536, 42 S.Ct. 212, 66 L.Ed. 357), we point out here that, upon the facts of this case, it could not be successfully availed of.

Paragraph 1559 of the Tariff Act of 1930 (19 U.S.C.A. § 1001, par. 1559), as amended by Public Law 768, section 201, 68 Stat., part 1, page 1137, reads—

> "Par. 1559. (a) Each and every imported article, *not enumerated in this Act,* which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; * * *." [Italics ours.]

By the terms of the statute, therefore, similitude may be invoked only in the event that an imported article is not enumerated in the statute. There is evidence in the record that a Cobalt–60 unit is a machine; that it is equipped with an electrical motor; and that it is in chief value of metal.

Consequently, if a Cobalt–60 unit is not an electrical therapeutic device nor an electrical X-ray apparatus, it is, nevertheless, enumerated in said paragraph 353 as an article having as an essential feature an electrical element or device; or in paragraph 372 as a machine, not specially provided for; or in paragraph 397 as an article, not specially provided for, in chief value of metal.

■ A basic principle applicable here requires that the plaintiff in order to succeed shall establish not only that the collector's decision was erroneous but that the claim relied upon by plaintiff is correct. Joseph E. Seagram & Sons, Inc. v. United States, 30 CCPA 150, C.A.D. 227, and United States v. Gardel Industries, 33 CCPA 118, C.A.D. 325.

At the trial, plaintiff introduced the testimony of two witnesses, Dr. Edrie Dale Trout and Dr. Martin A. Edwards, both of whom were highly educated and well informed in the science of radiology.

Dr. Trout, who for 8 years had been employed by the General Electric Co. as "consolidating radiation physicist" and was intimately familiar with the importations of Cobalt–60 therapy units by that company, was asked to describe "the make-up and general purpose of these particular Cobalt Units." He stated as follows:

"Well, a Cobalt Unit consists of a source shield made of lead, tungsten or some other heavy metal or a combination of the two. This source shield supported on some kind of a structure that permits its being positioned over a patient and pointed at the site of interest, which in this case would be a cancer to be treated."

The witness identified the cover pages of exhibits 3, 4, 5, and 6 as illustrations of the machines involved in these proceedings, which were manufactured by the Atomic Energy of Canada, Ltd., for use by hospitals and clinics for treatment of deep-seated cancer.

The testimony of Drs. Trout and Edwards was apparently designed to establish that gamma rays emitted by the cobalt units were in substance the same as the rays emitted by X-ray apparatus. Based upon this hypothesis, plaintiff contends that by reason of the similarity of rays and the identity of purpose in the treatment of cancer it follows that the cobalt unit is similar, if not identical, to X-ray apparatus, although X-ray apparatus produces rays for other medical and industrial uses for which the cobalt units are not designed or employed.

A motion of defendant to dismiss the case at the conclusion of the plaintiff's testimony was taken under advisement by the trial judge. It is now denied.

Defendant's witness, Donald Thomas Green, an engineering physicist, was at one time in the employ of the Atomic Energy of Canada, Ltd., and, as a matter of fact, was in charge of the design of the first commercial model of a Cobalt–60 machine, which was installed in London, Ontario, in 1950. Since that time, his specialty has been the designing of such equipment.

At the present time, Green is supervisor of an engineering group with Picker X-ray Corp., Cleveland, Ohio, which manufactures a great deal of X-ray apparatus. Based upon his knowledge of the construction and uses of cobalt units and X-ray apparatus, he explained the differences between the two commodities in the production and uses of radiation. The substance of his testimony may be summarized as follows:

The radiation in both cases is produced in quite different ways. In X-ray equipment, the radiation is created by accelerating electrons against a metallic target. When they strike the target, radiation is produced which is called X-rays— a name given to that radiation when first discovered by Dr. Roentgen "and the method that he used was basically the same method which is used today." The name continues as being applicable to

that method of producing that kind of radiation.

In the case of the cobalt equipment, the radiation is emitted spontaneously by isotopes of cobalt metal. While the record here is somewhat confused, it seems obvious that the witness was pointing out that there is no external source of power which is required to produce the radiation from the metal in Cobalt–60. It is an inherent characteristic of the metal, and there is no known way in which the radiation can be changed. On the one hand, you have the production of radiation by electrical means, and, on the other, by a spontaneous process occurring within the material itself.

In the case of the X-ray machine, the amount of radiation which is produced is a question of the design of the machine, and the way in which it is operated, and it is within certain limits under the control of the operator of the machine. By activating the electrical circuits involved, the production of the radiation can be stopped or started at will, and, to a certain extent, the amount of radiation produced can be controlled. It depends upon the particular machine. Once the Cobalt–60 source is segregated as an entity, there is nothing that can be done to change the amount of radiation which is produced by that source.

There is no natural cobalt element which is radioactive, but there is a natural cobalt element which can be made radioactive, by putting it in an atomic reactor or pile for about a year, and, when it is removed, part of the natural cobalt present has been converted to the radioactive type Cobalt–60.

■■■ It is not claimed here that the term "electrical X-ray apparatus" has a commercial meaning different from its common meaning. Many years ago, our appellate court announced the doctrine that tariff acts "are drafted not in the terms of science, but in the language of commerce, which is presumptively that in common use." Meyer & Lange v. United States, 6 Ct.Cust.App. 181, T.D. 35436. It is also well settled that the common meaning of a term used in a tariff provision is a matter to be determined by the court, and, in so doing, the court may rely upon its own knowledge of the term and it may, as an aid to its own understanding, resort to works of standard lexicographers, encyclopedias, or other sources of reliable information. Nix v. Hedden, 149 U.S. 304, 13 S.Ct. 881, 37 L.Ed. 745; United States v. John B. Stetson Co., 21 CCPA 3, T.D. 46319; and American Felsol Co. v. United States, 25 CCPA 367, T.D. 49454.

The problem confronting us is what meaning was ascribed by Congress to the words "electrical X-ray apparatus" in preparing the Tariff Act of June 17, 1930—in other words, what was the common meaning of that term.

The word "X-ray" appears to have been coined by a distinguished German scientist, Dr. Wilhelm Konrad Roentgen. Webster's New International Dictionary, 1930, says of X-rays—

"X-rays * * *. The Röntgen rays;—so called by their discoverer because of their enigmatical character * * *."

The same authority defines a Röntgen ray as follows:

"Röntgen ray. *Physics*. Any of the rays produced when cathode rays strike upon the surface of a solid (as the wall of the vacuum tube). Röntgen rays are noted for their penetration of many opaque substances, as wood and flesh, their action on photograpic plates, and their fluorescent effects. They were called X-rays by their discoverer, W. K. Röntgen. They also ionize gases, but cannot be reflected, refracted, or polarized, deflected by a magnetic field. They are regarded as nonperiodic, transverse pulses in the ether. They are used in examining opaque objects, as for locating frac-

tures or bullets in the human body. * * * "

■ Dr. Roentgen discovered the X-ray about the year 1895 and that type of apparatus, of course, was known to the Congress of the United States at the time of the passage of the Tariff Act of 1930. The cobalt units did not become a commercial product until about 1950. We realize, of course, that the mere fact of production at a later time than the passage of the Tariff Act would not, in itself, preclude classification of the cobalt units as X-ray apparatus if they were shown to be X-ray apparatus in the method of their production, their functioning, character, and use. Newman v. Arthur, 109 U.S. 132, 3 S.Ct. 88, 27 L.Ed. 883; Pickhardt v. Merritt, 132 U.S. 252, 10 S.Ct. 80, 33 L.Ed. 353. However, mere similarity of use between the new article and the article described in the tariff act is not sufficient to make the new article subject to classification in the tariff provision for the similarly described article. Gimbel Bros., Inc. v. United States, 22 CCPA 146, T.D. 47111.

The following differences established by the record between X-ray apparatus and Cobalt–60 units may be noted as follows:

Rays from the X-ray apparatus are produced by electrical means by accelerating electrons against a metallic target (tungsten, for instance). Upon sriking the target, radiation is produced.

In X-ray apparatus, the amount of radiation is controlled by the operator.

In Cobalt–60 units, the radiation which is produced by the spontaneous processes within the metal is fixed by the amount of cobalt used.

Moreover, while the radiation in X-ray apparatus remains constant, it appears that in Cobalt–60 units radiation decreases naturally and in about 5.2 years is reduced by one-half.

Radiation from Cobalt–60 units requires a thick shield of approximately 10 inches of lead in order that the radiation may be blocked to an extent not required in X-ray apparatus.

Whereas X-ray apparatus may be subject to failure of operation because of a tube, transformer, or other electrical disturbance, it is not common to Cobalt–60 units.

These dissimilarities in composition, structure, character, and manner of operation, as well as difference in name, of X-ray apparatus and Cobalt–60 units lead to the conclusion that the latter are not the X-ray apparatus of the tariff statute, within the principle of the Newman and Pickhardt cases, supra.

The distinction between X-ray and gamma rays is clearly indicated in the following quotation from the Encyclopedia of Chemical Technology (1953), volume 11, page 474, under the title of "Radiography, Industrial"—

"Industrial radiography is the science of nondestructive testing by means of penetrating radiation. This radiation may be *x-rays*, which are produced when electrons strike a target, or *gamma rays*, which behave like x-rays but are produced by disturbances within the nuclei. Gamma rays generally have shorter wave lengths and greater penetrating power than x-rays. Both x-rays and gamma rays are waves of electromagnetic energy as are light and radio waves, but they have much shorter wave lengths. X-rays have wave lengths of 0.04–500 A; gamma rays have wave lengths of about 0.010–1.40 A. * * * " [Italics quoted.]

A recent decision of our appellate court in Davies Turner & Co. v. United States, 45 CCPA 39, C.A.D. 669, clearly supports our conclusion herein. The court was there concerned with the question whether certain imported merchandise should be classified as "bent-wood furniture."

The opinion of the appellate court stated that the merchandise before it consisted of chairs resulting from two distinct manufacturing processes. One was known as "ribboning," where the elements are formed by making a number of parallel saw cuts in the wood to be bent,

inserting strips of wood combined with glue in the saw cuts, bending the wood by hand or air pressure, and clamping it in a form until the glue is set. In the other process, known as "laminating," strips of wood, glued on both sides, are laminated under pressure and simultaneously bent to the desired form, then dried.

It appears further that bent-wood furniture was first made in Vienna, Austria, more than one hundred years ago by a process which involved subjecting solid pieces of wood to steam or boiling water, rendering them pliable, then bending to the desired shape until dried, after which they retained the bent shape. Further, it was agreed that furniture made in this manner was the only "bent-wood" furniture known when the Tariff Act of 1930 was enacted, and that the ribboning and laminating processes were not developed until several years later.

In its opinion, the appellate court stated that the lower court "emphasized its reliance on the subsequent meaning of the term 'bent-wood,' rather than on its meaning in 1930," in the following language:

"We have examined the definitions and matter contained in the dictionaries, encyclopedias, tariff summaries, and tariff hearings, cited by plaintiff, and *believe that the later ones*, that is, those *subsequent in date to 1930* or the time when furniture such as that at bar first became known to the trade and commerce of the United States, *do not limit the terms 'bent-wood' or 'bent-wood furniture' to articles, the parts of which are of solid wood made pliable by steam or hot water*." [Italics quoted.]

The appellate court then commented as follows:

"While we unquestionably agree that the 1930 meaning would not include the instant merchandise, we do not think the decisions of this and other courts support the conclusion that the later meanings, as distinguished from that prevailing in 1930, are applicable."

The court also pointed out two well-established principles of customs law, one, that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of enactment of the act (citing cases), and the other, that tariff acts are made for the future as well as the present, and will embrace merchandise which was not known to commerce at the time of their enactment (citing cases).

Further, the court stated that—

"While some of the definitions prevailing in 1930 contain broad language, it seems clear that paragraph 412 was not intended to include *all furniture* which contained any piece of wood which had been bent in any manner. * * *" [Italics quoted.]

It was the opinion of the court that Congress, by employing a hyphen in the term "bent-wood," must have intended to restrict the meaning of that term to the type of furniture known by the name at that particular time, rather than to broaden it to include all types of furniture which contained wood that was literally bent.

Analogical reasoning leads to the conclusion that Congress, in providing for "electrical X-ray apparatus" in 1930, intended that term to be restricted to the basic type of apparatus employed by Roentgen.

As stated by defendant's witness Green, X-ray equipment radiation is produced by accelerating electrons against a metal target. The radiation so produced is known as X-rays—the name given by Roentgen. According to Green, the method so used by Roentgen is "basically the same method which is used today. The name has stuck as being applicable to that method of producing that kind of radiation."

On the other hand, in cobalt equipment, radiation "is emitted spontaneously by isotopes of Cobalt metal."

Other differences indicated, supra, in the functioning and control of X-ray ap-

paratus and cobalt units lend emphasis to the fact that cobalt therapy units are not of the type of apparatus encompassed by the term "electrical X-ray apparatus" provided for in said paragraph 353.

This conclusion finds support in the Summaries of Tariff Information, volume 3, part 3, page 102, issued by the United States Tariff Commission in 1948, from which we quote—

"Comment

"This summary covers X-ray apparatus for both medical and industrial purposes and other apparatus for electrical therapy and diagnosis. X-ray equipment comprises the tubes in which the rays are generated and the apparatus for supplying and controlling the operating current. In the X-ray tube a target of refractory metal in an exhausted glass tube is bombarded by a stream of electrons, causing the target to emit X-rays, which pass out through the walls of the tube. The electrons are emitted from a heated filament in the tube and are directed against the target by a high electrical potential which is maintained between filament and target by a transformer or other means. X-ray apparatus is used for medical and dental diagnosis, for therapeutic treatment, for inspection of steel and other metal materials and articles, and for routine and research work in chemistry and physics. Other electrical therapeutic and diagnostic apparatus include apparatus for use in surgery, for heating interior parts of the body, and for analyzing the action of the heart."

From the facts of record and the authorities cited, we find and hold that Cobalt–60 therapy units and their parts are not "electrical X-ray apparatus" within the meaning of that term in said paragraph 353, as modified, supra.

In view of this conclusion, the protests are overruled, and judgment will be entered accordingly.