In view of this conclusion, the protests are overruled, and judgment will be entered accordingly.

(C.D. 2130)

E. Dillingham, Inc. *v.* United States

United States Customs Court, Second Division

(Decided October 28, 1959)

*Wood, Werner, France & Tully* (*James H. Tully* and *John T. Redmond* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action is a companion to the case of *Salentine and Company, Inc.* v. *United States*, 43 Cust. Ct. 211, C.D. 2129, decided concurrently herewith. By agreement of adversary counsel, the record in the *Salentine* case is incorporated as a part of the record in this proceeding.

The merchandise in the two cases, produced by the Atomic Energy of Canada, Ltd., of Ottawa, Canada, consists of Cobalt-60 therapy units differing in certain respects which are immaterial to a consideration of this case.

The importation now before us is a large device weighing approximately 4 tons. It consists of an arc-shaped movable arm mounted on a supporting stand. The machine head, so-called, which is composed of lead in a steel casing, is located in the upper portion of the arm and weighs approximately 1 ton. Cobalt, a natural element, has by treatment in an atomic reactor become converted to the radioactive type Cobalt-60. In this form, the Cobalt-60 is placed in the center of the machine head and becomes the source of the rays which it emits in all directions. As a precaution, the rays are confined by a thick lead lining except at a point in the lower portion of the head where there is a small opening which may be regulated by the operation of a shutter of tungsten or lead, to permit the projection of the rays which are capable of deep penetration of the human tissue in the treatment of a cancer patient.

A portion of the arm which weighs about 1 ton acts as a counterweight to the head and absorbs the excess radiation passing through the patient under treatment.

Another portion of the unit consists of a treatment table which may be elevated or lowered, or moved backwards or forwards by power generated by an electric motor permitting the proper position of the patient to receive cobalt rays.

The collector of customs classified the device as an electrical therapeutic apparatus, and duty was imposed thereon at the rate of 17½ per centum ad valorem as provided in paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

Plaintiff contends that the importation should be classified as electrical X-ray apparatus within the meaning of said paragraph 353 and dutiable at the rate of 8¾ per centum ad valorem as provided by the Torquay protocol to said general agreement, 86 Treas. Dec. 121, T.D. 52739, supplemented by the Presidential notification thereto, 86 Treas. Dec. 265, T.D. 52763.

### The Statutes

Paragraph 353 of the Tariff Act of 1930 and modifications thereof pertinent here are set forth below:

Paragraph 353 of the basic act:

All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

Paragraph 353, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802:

Electrical apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

Telegraph (including printing and typewriting), telephone, and therapeutic (including diagnostic) _____ 17½% ad val.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X-ray_____ 10% ad val.

Paragraph 353, as modified by the Torquay protocol to said general agreement, 86 Treas. Dec. 121, T.D. 52739, supplemented by Presidential notification thereto, 86 Treas. Dec. 265, T.D. 52763:

Electrical X-ray apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (except X-ray tubes)_____ 8¾% ad val.

At the trial, plaintiff, in addition to the incorporation of the record in the *Salentine* case, called two witnesses and at the close of their testimony the case was submitted.

The first witness, Dr. William Bierman, a licensed physician of acknowledged qualifications in the field of physical medicine and re-

habilitation, was examined with a view to establishing, if possible, a distinction between electrical therapy apparatus in the treatment of human disease and the treatment of disease by radiation therapy with the use of the Cobalt–60 therapy units or of electrical X-ray apparatus when raised to a high potency.

Plaintiff's second witness, Dr. Frank Batley, a highly qualified physician who specializes in the use of radium, X-ray therapy, cobalt therapy, and other shortwaves in the treatment of cancer, explained that "radio-active cobalt emits waves of very short wave lengths, 1.1 and 1.3 million volts energy. If these were produced by an X-ray machine, it would take a million volts and a million and a third volts to produce radiation of the same quality." He asserted that the rays produced from an X-ray machine of such a high voltage would be identical with the rays produced by Cobalt–60 units.

With the use of illustrative exhibit 3, a model of the imported machine, Dr. Batley explained its mechanical operation which has been outlined above.

When asked if cobalt units take pictures "the same as x-ray of 2 million volts," Dr. Batley replied, "Yes. It is not primarily designed for that," adding that an X-ray machine for taking pictures is a much smaller type. As to whether a cobalt unit functions the same as an X-ray machine, Dr. Batley stated, "It does, of the same quality. A 3 or 4 million, it is usually stated, but 3 million volts x-ray machine or 4 million volts x-ray machine produce radiations of the same quality as this for treatment purposes."

With the use of a photograph, illustrative exhibit 4, a General Electric two million volt X-ray machine's mechanical construction was described by Dr. Batley as follows:

In an x-ray machine, you have an evacuated glass envelope with a cathode at one end and an anode at the other and the electrodes are shot across, propelled across the x-ray tube under the force of the tremendous electrical voltage that you put across the tube. They are focused on this electrical anode. The moment they meet, they collide with the electrons of the atoms of the metal target and this disturbs the atoms; it pushes them around the orbit and this disturbs—this disturbance produces electromagnetic radiation which is called x-rays. These x-rays are allowed to come out of the tube; they are shielded in some situations. The x-rays are coming off in all directions from some of these x-ray machines and you have to shield the radiations off that you don't need and so produce a beam of radiation to hit the patient or the portion that you are taking the x-ray picture of. The time when x-rays were in use in 1910 and '14, 200,000 volts was a tremendous voltage to produce but as electronics have improved, we got voltages of 4 million volts and I think there is one in California that produces 50 million volt x-ray.

Following this description, Dr. Batley was asked if the names gamma ray and X-ray merely denote the source, to which he replied, "Yes, the source. If it is coming *from a radio-active material, you call*

*it gamma ray*; if it comes *from an x-ray tube, you call it x-rays.*" [Italics added.]

When asked by the court if the X-ray gets its energy entirely from electricity, Dr. Batley replied, "The electricity is used to produce the high speed electrons and in that way, you could say that the x-ray energy, sir, is produced from electricity."

To the question whether the gamma rays used electrical energy, the witness replied, "If you use radium you don't but for cobalt, you need electrical energy. The cobalt is prepared in the nuclear pile in which you need electrical energy." Then he added "No, I should retract that because the uranium rods are used in the nuclear piles."

On cross-examination of Dr. Batley, it became evident that electricity plays an important part in the functioning of a cobalt therapy unit through the use of an electric motor.

The initial contention of plaintiff is stated in POINT I of its brief as follows:

THE COBALT 60 UNIT SHOULD BE CLASSIFIED AS X-RAY APPARATUS WITHIN PARAGRAPH 353 BY VIRTUE OF THE SIMILITUDE PROVISIONS OF THE TARIFF ACT.

As we stated in our opinion in the *Salentine* case, the similitude claim is unavailing.

Paragraph 1559 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 1559), as amended by Public Law 768, section 201, 68 Stat., part 1, page 1137, which contains the so-called "similitude clause," reads, insofar as pertinent here, as follows:

PAR. 1559. (a) Each and every imported article, *not enumerated in this Act,* which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; * * *. [Italics ours.]

The statute above quoted, by its terms, clearly excludes from its operation any imported article which is enumerated in the act. For reasons which will appear, *infra,* it is our opinion that the importation in controversy is not an electrical X-ray apparatus in law or in fact, and it can not be so classified by similitude to electrical X-ray apparatus. Since Cobalt-60 units are electrical devices in the sense of paragraph 353, they are within the provision therein for electrical therapeutic apparatus or as articles having as an essential feature an electrical element or device; or in paragraph 372 as machines, finished or unfinished, not specially provided for, or in paragraph 397 as articles, composed wholly or in chief value of metal. Each of these provisions is an *enumeration* within the concept of the similitude clause.

There is evidence in the record which discloses substantial differences between Cobalt-60 units and X-ray apparatus not only in name but in composition, construction, and functional activities. The only

points of similitude are that both are electrical and both have one use in common. The principal and primary use of Cobalt-60 units is in the treatment of deep-seated cancer, whereas X-ray apparatus has various therapeutic, diagnostic, and industrial uses but can, when its potency is increased to the equivalent of Cobalt-60, be used for treating deep-seated cancer.

X-rays are produced by electrical discharges in a cathode tube which bombard a metal shield.

In the case of a Cobalt-60 unit, however, cobalt, a metal element, contains no radioactive quality. However, when treated in a reactor, isotopes of the cobalt metal become highly radioactive and the material is then known as Cobalt-60. The gamma rays produced by it are so powerful that it becomes necessary to contain them in a so-called "head" with a very thick casing of lead, whereas the rays produced by the X-ray apparatus are more easily contained and utilized.

It is a well-known matter of history that the word "X-ray" was coined by an eminent German scientist, Dr. Wilhelm Konrad Roentgen. We quote from Webster's New International Dictionary, 1930—

X-rays * * *. The Röntgen rays;—so called by their discoverer because of their enigmatical character * * *.

The same authority defines a Röntgen ray as follows:

Röntgen ray. *Physics.* Any of the rays produced when cathode rays strike upon the surface of a solid (as the wall of the vacuum tube). Röntgen rays are noted for their penetration of many opaque substances, as wood and flesh, their action on photographic plates, and their fluorescent effects. They were called *X rays* by their discoverer, W. K. Röntgen. They also ionize gases, but cannot be reflected, refracted, or polarized, or deflected by a magnetic field. They are regarded as nonperiodic, transverse pulses in the ether. They are used in examining opaque objects, as for locating fractures or bullets in the human body. * * *

As stated by defendant's witness, Green, whose testimony appears in the *Salentine* record, incorporated herein, radiation produced by X-ray equipment is known as X-ray—the name given by Roentgen, and the method used by Roentgen is "basically" the same method which is used today. The name has continued being applicable to that method of producing that kind of radiation.

Inasmuch as there is no claim here that the term "electrical X-ray apparatus" has a commercial meaning different from its common meaning, it must be presumed that the common and commercial meanings are the same. *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T.D. 35436. Moreover, the common meaning of a term is the meaning by which a thing is generally and popularly known rather than a meaning ascribed to a term by scientists or specialists. Furthermore, the meaning of the term "electrical X-ray

apparatus" must be determined as of the date it was introduced into the Tariff Act of 1930.

Obviously, the X-ray apparatus of the type used by Roentgen, at the time of its discovery in 1895, was well known to the Congress when it specifically provided for electrical X-ray apparatus in the Tariff Act of 1930, whereas the Cobalt-60 units did not come into the commercial field until 1950. We realize, of course, that a tariff term may speak to the future and embrace things which were not known at the time the statute was enacted. However, we are clearly of the opinion, in view of the facts of record, that a Cobalt-60 apparatus is not commonly known as an X-ray apparatus.

While we do not regard the terms "electrical therapeutic apparatus" and "electrical X-ray apparatus" as terms of doubtful meaning requiring resort to extraneous aids in their interpretation, nevertheless, we deem it appropriate to refer to the Summaries of Tariff Information, volume 3, part 3, issued by the United States Tariff Commission in 1948, wherein the following appears at page 102:

### COMMENT

This summary covers X-ray apparatus for both medical and industrial purposes and other apparatus for electrical therapy and diagnosis. X-ray equipment comprises the tubes in which the rays are generated and the apparatus for supplying and controlling the operating current. In the X-ray tube a target of refractory metal in an exhausted glass tube is bombarded by a stream of electrons, causing the target to emit X-rays, which pass out through the walls of the tube. The electrons are emitted from a heated filament in the tube and are directed against the target by a high electrical potential which is maintained between filament and target by a transformer or other means. X-ray apparatus is used for medical and dental diagnosis, for therapeutic treatment, for inspection of steel and other metal materials and articles, and for routine and research work in chemistry and physics. Other electrical therapeutic and diagnostic apparatus include apparatus for use in surgery, for heating interior parts of the body, and for analyzing the action of the heart.

The foregoing quoted matter clearly indicates that the type of apparatus there being considered is the well-known X-ray apparatus and would not include Cobalt-60 units. This information was available to the negotiators when the General Agreement on Tariffs and Trade and subsequent protocols thereto were under consideration.

A recent decision of our appellate court in *Davies Turner & Co.* v. *United States*, 45 C.C.P.A. (Customs) 39, C.A.D. 669, clearly supports our conclusion that Cobalt-60 units are not within the common meaning of the term "electrical X-ray apparatus," as that term is used in said paragraph 353.

In the *Davies* case, *supra*, the appellate court held that chairs made of bent-wood resulting from manufacturing processes known as "ribboning" and "laminating" were not bent-wood furniture within the provision therefor in the Tariff Act of 1930, it being the opinion of the court that it was the intent of Congress to limit the term "bent-

wood furniture" to articles the parts of which are of solid wood made pliable by steam or hot water which was the manufacturing process used at the time of the passage of the basic tariff act.

Applying the reasoning of the court in the *Davies* case to the facts in the instant controversy, it is our opinion that it was the intent of Congress to restrict the provision for "electrical X-ray apparatus" to the basic type of apparatus employed by Roentgen.

It follows, therefore, that Cobalt-60 units are not classifiable directly as electrical X-ray apparatus. For reasons stated above, they can not be classified thereunder by virtue of the similitude clause in paragraph 1559.

Plaintiff having failed to establish that Cobalt-60 therapy units are in fact or in law electrical X-ray apparatus within the intendment of that term in paragraph 353, as modified, *supra*, it has not made out a *prima facie* case, and consistent with our ruling in *Salentine and Company, Inc.* v. *United States*, *supra*, the protest is overruled, and judgment will be entered accordingly.